# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

BRIAN C. DOWNING,          )
an adult individual resident of Waldoboro,  )
County of Lincoln, and           )       **JURY TRIAL REQUESTED AND**
State of Maine,               )       **INJUNCTIVE RELIEF SOUGHT**
                             )
      Plaintiff,             )
                             )     CASE NO.
      v.                    )
                             )
SELECT REHABILITATION, INC.     )
a foreign corporation registered to     )
do business in the State of Maine,    )
                             )
      Defendant           )

## COMPLAINT

NOW COMES the Plaintiff, Brian Downing, and makes the following complaint against Select Rehabilitation, Inc. ("Select").  Downing repeatedly reported to Select that it was wrongfully billing Medicare for patient services that were not needed and that it was refusing to discharge patients who no longer needed services but for whom Select wanted to keep on billing. Medicare was charged by Select for services that were not actually needed.  In addition, Select was making patient treatment decisions based on whether the patients were Medicare B patients versus Medicare A and whether it had to share any of the billing revenue with Cove's Edge where the services were provided.  The decisions should have been made based on patient needs and what was best for the patient.  Downing was fired for reporting such illegal conduct and for reporting what he believed to be a violation of the standard of care for the patients.

## NATURE OF THE ACTION

1.     This is an action under the laws of the State of Maine, including the Maine Human Rights Act (hereinafter, the "MHRA"), 5 M.R.S. § 4551, *et seq.*, and the Whistleblowers' Protection Act, 26 M.R.S. § 831 *et seq.* ("the WPA").

2.    Defendant discharged the Plaintiff from his position with Select in retaliation for him repeatedly reporting billing practices he reasonably believed to be a violation of law.  In addition, Downing, acting in good faith and consistent with state and federal privacy laws, reported to Select what he had reasonable cause to believe was an act or omission that constituted a deviation from the applicable standard of care for a patient by an employer charged with the care of that patient.

## PARTIES

3.    Plaintiff Brian C. Downing is a resident of the town of Waldoboro, Lincoln County, State of Maine.

4.    Select is an Illinois corporation with a principal place of business in Glenview, Illinois. Select contracts to provide physical, occupational and speech therapy services to patients in skilled nursing facilities, hospitals and rehabilitation centers.

5.    Select had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as, or in the calendar year prior to, when the illegal conduct alleged in this case occurred.

## JURISDICTION AND VENUE

6.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as this Court has original jurisdiction of all civil actions where the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and that are between citizens of different states.

7.    Plaintiff is a citizen of Maine, and defendant is a corporation incorporated under the laws of the State of Illinois having its principal place of business in Illinois.  The amount in controversy exceeds, exclusive of interest and costs, $75,000.00.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Maine Local Rule 3(b) because a substantial part of the events or omissions giving rise to the claims occurred in

this District, specifically in Damariscotta, Lincoln County, Maine.

9.      On September 11, 2014, Downing filed a complaint of discrimination with the Maine

        Human Rights Commission ("MHRC").

10.     On or about September 11, 2014, Downing filed with the Equal Employment Opportunity

        Commission ("EEOC") a charge of discrimination.  The charge of discrimination was

        timely filed and included the discrimination complained of in this Complaint.

11.     On July 1, 2016, the MHRC determined that there were reasonable grounds to believe

        that unlawful discrimination had occurred by Select.  Subsequent efforts at conciliation

        failed, and Downing has properly instituted this action after exhausting his administrative

        remedies.  *See* 5 M.R.S. §§ 4612(3), 4622(1).

## JURY DEMAND

12.     Plaintiff demands trial by jury of all claims to the extent allowed by law.

## FACTUAL ALLEGATIONS

13.     In September 2004, Downing began working for Lincoln County Healthcare as an

        Occupational Therapist.  He worked in two capacities for Lincoln County Healthcare: in

        Cove's Edge, which is the skilled nursing care unit and long term care unit, and for the

        Home Health Division, for which he made visits to patients' homes.

14.     In 2005 and 2010, Downing received President's Awards from Lincoln County

        Healthcare.  This award is presented by the hospital's President for going above and

        beyond to provide services.

15.     In late 2005, Downing began working per diem for Genesis Healthcare in Camden,

        Maine, as an Occupational Therapist, while still working at Cove's Edge.

16.      In early 2013, Select negotiated a contract with Lincoln County Healthcare to provide

        the rehabilitation services for the Cove's Edge facility.  Downing was offered a position

working for Select at Cove's Edge and negotiated the position with John Murray, the Regional Vice President of Select, and Robert Davis, Select's Regional Manager.

17. When he was hired by Select, Downing told Murray and Davis that he had a dual role working both at Cove's Edge and in the Home Health Division.  Select could not offer Downing 40 hours a week at the Cove's Edge facility, so he was allowed to continue working for the Home Health Division approximately 4+ hours a week.

18. When he went to do this other work, he was working for Lincoln County Health Care still, which includes the hospital, Cove's Edge, the home health department, and some primary care physician practices.  Before Select came in, he was working for Lincoln for 36 hours at Cove's Edge and another 4 hours for Lincoln in its home health department.

19. Then Select contracted with Cove's Edge to provide services.  Downing thereafter worked 36 hours for Select in the Cove's Edge facility and continued to do his four additional hours for Lincoln in the home health department.  Both before Select came in and afterwards, Downing was working under the Lincoln umbrella for all 40 hours.

20. Downing typically completed his home health visits after his day with Select, but, on occasion, he had to split his day between Cove's Edge and his home health patients, which Select knew about and approved.

21. In January 2013, Downing started working for Select at Cove's Edge.  He title was Staff Therapist and Backup Manager.

22. When Select started to run Cove's Edge, it put in place a system that delayed patients being discharged and, in some cases, denied discharge even when clinically appropriate.

23. For Medicare B patients, the process was that therapists had to fill out a discharge checklist and then discharges were discussed at a weekly meeting.  Select would make decisions about discharge even though it didn't have the discharge checklists to make the

decision on a medical, need-of-the-patient basis.  As a result, patients were kept on rehabilitative therapists' caseloads longer than the patients needed for their own care.

24.     For Medicare B patients, Select also got to keep 100% of the money collected and did not have to share income with Cove's Edge.

25.     Medicare B patients are generally long term care patients who live at Coves Edge on the nursing home unit of the building and would receive therapy services if they had a decline in function.

26.     Short term skilled-care patients are Medicare A and the income brought in had to be shared with Cove's Edge.  The Medicare A patients' treatment plans had to be re-certified by a medical doctor every 30 days.

27.     The fact that income had to be shared and the need for re-certification by a doctor every 30 days made Medicare A patients less financially attractive to Select.

28.     Medicare B patient treatment plans, in contrast, had to be recertified by a medical doctor only every 90 days.  Not needing a doctor to re-certify for 90 days allowed Select to deny discharge from treatment for a longer period of time to gain as much revenue as it could in 90 days prior to needing a doctor to re-certify the continuation of services.

29.     There were thus several practices going on that Downing believed were illegal and that deviated from the applicable standard of care for a patient by an employer charged with the care of that patient:  1) billing the government for services on the long term Medicare B patients by not approving discharges even when the therapist had determined that services were no longer needed; and 2) denying Medicare B patients discharges more than Medicare A patients because Select could make more money off them since Cove's Edge did not get a share of those billings.

30.     Select even hired a person, Bobby Schaffer, to put the brakes on discharges.  Schaffer would write up why the patient should continue services even if the therapist opined that they did NOT need additional services.

31.     Schaffer was a physical therapist (PT) making a decision about occupational therapy (OT) patients.  In other words, he was not qualified to make decisions about discharge of OT patients.

32.     Even more inappropriate, from April/May 2013 to October/November 2013, Schaffer made his decisions based on only billing information and no treatment documentation at all.  In other words, Select was allowing *treatment* decisions to be based on *billing* information.

33.     Even when a patient was clinically appropriate for discharge, this Select employee, Bobby Schaffer, was denying discharge.  He refused to talk to the actual therapists treating these patients and Select banned such communication.  Treatment plans were legally required to be done by the evaluating therapist.  This employee was NOT the evaluating therapist yet was making decisions about the continuation or termination of treatment services.

34.     So that they wouldn't get blamed for the illegal refusal to discharge, therapists started keeping copies of Schaffer's emails so it was clear that they were not part of the scheme to keep on billing for unneeded services.  The documentation showed that some office guy in some unknown location was making decisions about patient needs for continued treatment without ever seeing the patient, or knowing the patients or evaluating the patients.

35.     Shafer was removed from the discharge process after it was discovered that therapists were keeping copies of emails from him explaining why clients were not being

discharged.  After this, Davis began making those decisions, and the therapists did not get emails about or other records of decisions any more.

36.     There was no more paper trail, but the same problems with delays and denials continued.

37.     The therapists found out about whether a patient was going to get discharged when Bobby Schaffer or Davis approved the discharge.

38.     In June 2013, Sue Martin applied to work at Select.  Martin had a history at a prior employer of not following established weekly frequencies a patient needed to be seen.  In addition, Martin was frequently seen having a group of more than four patients of the facility and billing for full time.  This violated Medicare.

39.     Medicare at the time allowed only 4 patients in a group.  Medicare has now changed the requirement to only being able to bill a portion of the time a patient is in a group. Downing was aware of this illegal conduct by Martin at this prior employer.

40.     Martin also would change staffs' time billed in the billing software to get higher Resource Utilization Groups ("RUGS") on clients.  This was brought to his previous employer's attention by Downing and shortly thereafter Martin was terminated from that employer.  This conduct was also a violation of Medicare.

41.     Under the circumstances, Downing was worried about having to work with Martin.

42.     Martin was hired in June/July 2013 as a staff Physical Therapy Assistant at Select.

43.     In November 2013, supervisor Laura Smith provided her resignation notice and interviews began for a replacement.  Martin applied for the position.  Downing went to Davis and reported his concerns regarding Martin as a potential supervisor due to her history of Medicare violations and substandard treatment of patients.

44.     The following week Davis announced that Martin was the new supervisor.

45.     Martin began acting in her new role as supervisor late November 2013.

46.   In early December 2013, Martin told the team that Davis had told her to inform the therapists that discharge requests would not be approved unless there was another Medicare B patient to replace the patients being discharged.  Downing told Martin that this was inappropriate and sounded like illegal billing.  She did not reply.

47.   In December 2013, Downing became aware that Martin was treating Medicare B clients differently than Medicare A clients.  If Select was short staffed, Martin would remove the Medicare B clients before removing Medicare A clients.  By removing the Medicare B clients first, Martin was protecting Select's billing at the expense of Medicare B clients, and caused the clients not to meet their clinically established frequencies developed by the therapist based on the plan signed the physician.

48.   Not meeting patients' required frequencies constituted substandard care.  At Select, it also violated Medicare.  Select was required to inform the physician and get a signed order if the weekly frequency was not met on a client, but this was not being done.

49.   Downing had a reasonable belief that this order from the physician was a legal requirement for Medicare patients.  Murray, a Select Vice President, and Davis were aware of these issues because Downing let them know that Martin had also done this with her previous employer.

50.   Select also would push therapists to provide therapy – whether or not needed – to patients to reach the cap on payments and would then push a discharge once the cap was reached, even if the patient needed additional services.  This had never been the practice for Lincoln County Healthcare.  Downing believed this conduct constituted a deviation from the applicable standard of care for the patients.

51.   On December 12, when Downing arrived at work, he learned that a home health client of his could not be at an appointment he had previously scheduled with her after his day was done at Select.  He looked at his schedule, was free at noon, so told the client he would

make time for her then.  He usually arrived at work around 6:00am, and Martin did not arrive until 9:00am.  Because Martin was not in yet and Downing wanted to let her know as soon as she came in, he left her a note on her desk that he would be out briefly at noon for this client visit.

52.  When Martin arrived, Downing apologized for this last minute change.  She asked for 24 hours' notice in the future because that is what she wanted.  Downing told her he thought her rule was to alert the supervisor the *night* before, and she said that was "bullshit." Downing agreed to comply with her new policy.

53.  Prior to Select coming in, there had been no notice rule at all.  Downing just had to perform nine hours of service for Lincoln County Health Care each day.

54.   Downing reported Martin's response to Davis on December 12.  Davis's response was, "are you kidding me?"  Davis then said he would try to get to the facility on Monday (December 16) to deal with it.

55.  On December 16, 2013, Downing met with Davis to discuss several issues Downing had with Martin, including what he believed was not legal and also what he believed were deviations from the standard of care for patients.

56.  Downing also asked Davis to clarify a new policy that had recently been announced by Martin.  The policy was that therapists were not allowed to contact physicians or facilities about clients' needs.  They were told to instead go through a social worker or nurse.

57.  Not being able to contact facilities for information about a client's prior level of function, thus limiting the ability to appropriately develop a treatment plan for the clients, constituted a deviation from the standard of patient care.  Downing told Davis this.

58.  Davis then invited Martin into the meeting, and the discussion continued.  At the end of the conversation, Davis told Martin and Downing that, if a physician asked a Downing

for information, he could provide it.  He asked Martin to clarify the company's policy with the Cove's Edge administration.

59.   Imagine Downing's surprise when, a full month later, he was briefly shown (but not given) a "verbal warning notice" about this issue.

60.   Select's notes about the meeting correctly state that there was discussion about an issue with a new facility policy regarding discussing patient information with others.  The Select documentation correctly notes that Downing reported that he had been directed not to talk with anyone and to refer questions to Social Services or the Program Manager. Yet the document was in the form of a warning, a month later, to Downing.

61.   At the December 16 meeting, Davis asked both Downing and Martin to work on their communication.  Neither was given any kind of warning, let alone a written warning, at the time.

62.   A month later, just Downing was.

63.   On January 3, Downing was in Cove's Edge storage room when a Certified Nursing Assistant (CNA) approached him.  She asked about using a "scoot chair" with a client he had seen the previous day.  He told her it was a good idea but couldn't provide a recommendation because Martin rejected an order for that client the previous day. Medicare requires an order before reimbursing for services, so Select employees were encouraged not to recommend services without getting a doctor's order because Select otherwise would not be paid for making the recommendation.

64.   After the CNA received permission to use the scoot chair with the patient, Downing noticed the chair was too low and told Martin because he was concerned for the safety of the staff when doing a transfer.  Martin told him to speak with the Director of Nursing, which he did.  That was his sole involvement with the chair.

65.    Imagine his surprise when he was later disciplined for allegedly going to storage to get a

scoot chair for a resident and placing the resident in the chair without an order and saying

he did not need an order!  (This was written in a discipline notice he was given nearly

two weeks later on the day he was fired.)

66.    Also on January 3, Downing was approached by Dr. Dickens who wanted Downing to

contact a patient's orthopedic physician to hip precautions prior to discharge.  Downing

reviewed his notes and told Dr. Dickens what he knew about the patient but that he

couldn't call another doctor about his question because Select's policy was that therapists

could not talk about patient discharge planning.  Downing was actually following

Select's policy here as announced at the December 16, 2013, meeting.

67.    Despite Downing following Select's policy, this communication was then used as a

claimed basis for his termination in a pretextual warning dated January 9, 2014 (a

warning not shown to Downing until January 14 and never given to him).

68.    Around the same time, Dr. Coughlin asked Downing to call another doctor (Dr. Moran)

to update him on a patient status.  Downing had to tell Dr. Coughlin that he wasn't

allowed to call a doctor to provide updates.  Martin was sitting right there when he said

that and Martin agreed and repeated what Downing had just said.  Dr. Coughlin was not

happy about that.  At the same time, Downing had done just as educated by Davis and as

approved by Martin.

69.    Imagine Downing's surprise when Select used this interaction as a claimed reason to

terminate him!  This interaction was put in the January 9, 2014, "Written Warning

Notice" that Downing was shown but not given on January 14, 2014.

70.    On January 6, Martin went to Downing's desk and accused him of putting a patient in a

chair and said he had put the client at risk by not doing an evaluation.  He reminded her

that nursing had put the patient in the chair, not himself.  He explained he had wanted to

do an evaluation because he was concerned about the client but was told not to do so by her.  He stated this client was at risk for injury without this chair, so he did not stop nursing from using the chair with the patient.  Martin told him that he worked "for a for-profit company and providing free treatment does not produce revenue."

71.    On January 9, Downing was pulled into a conference call with Murray, the Regional Vice President.  Murray brought up the chair incident, and Downing explained what had actually happened.  Murray said he understood and would follow up with nursing. Because Murray and Downing spoke about this incident, and he said he would follow up with nursing, Downing was shocked to see it mentioned later as one of the bases of his termination.  Murray knew the allegation was wrong as of January 9th.  The Warning written up on the 14th acknowledges that all Downing did was clear the path for nursing to take the chair.

72.    On January 9, 2014, during the conference call with Murray, Murray said that he had heard that Downing made negative comments about the Nursing Department and making negative comments about Select to Nursing.  He discussed how good a therapist Downing was.  He said that he wanted Downing's services to continue at Coves Edge.

73.    Murray said that Select had a lax policy with who staff can speak with and, if Downing wanted to speak with the Administrator, he could.  Downing told him he had never requested to speak with the Administrator, and the only negative comments he had made about Select were about the discharge policy, which he believed was illegal.  Murray did not respond.

74.    Murray was unable to provide any example of any negative statement made by Downing.

75.    Downing again expressed his concern about the Medicare B patients not being discharged by Select and about how this practice was illegal.  Even if a therapist made a clinical decision to discharge a patient from treatment, the patient was not actually discharged

until someone in the Select corporate office in Illinois approved the therapist's request for discharge.  He also once again reported the illegal nature of more frequently denying Medicare B patients as opposed to Medicare A on the basis of being able to get all the payment for them as opposed to actual medical need determined by the treating therapist.

76.     After this January 9 meeting, having been told by the Vice President he could speak to whom he wanted, Downing did go to check in with the Director of Nursing ("DON") to make sure he hadn't offended her.  In doing so, he did not think he was violating anything nor did he in fact violate any rule or instruction.  Select had the same impression:  Select did not include this issue on either warning Downing received on the day he was terminated – in other words, it wasn't as important even as the use of post it notes to put in either of the two warnings.

77.     Downing went and spoke with the Director of Nursing and the Nursing Educator on January 10, 2014.  They confirmed that had never spoken with Murray or anyone else at Select corporate about him making negative comments.  In other words, they confirmed that Murray had lied about that.

78.     Downing then told Davis he had spoken to the Director of Nursing and Nursing Educator regarding this accusation and made him aware that they had told him that they had heard no negative comments made by Downing from their staff and had not spoken to a representative from Select regarding his behavior or performance.  Davis did not tell Downing he had done anything wrong in talking to the DON or write him up.

79.     Imagine Downing's surprise when a May 1 letter from Select stated that talking to the DON was a basis for his termination!

80.     On January 14, 2014, Davis asked Downing to speak with him in the dining room.  He laid two documents on the table.  The first was a "Verbal Warning Notice" dated January 14th, although it referred to the meeting Downing had with Davis and Martin on

December 16, 2013.  This was four days after the phone call Downing had with the Vice President in which Downing told the VP that the discharge practice was illegal.

81.   The second was a "Written Warning Notice," also dated January 14th, which listed four negative incidents Downing was allegedly involved in between January 3-7, 2014.

82.   Downing was surprised he was getting a verbal/written warning for a situation a month prior when it was simply a discussion.  Davis stated that he understood but was told by Murray to do it.  Martin was never given a warning for using notes.

83.   One of these write ups on Downing was for him using a post-it note to let Sue Martin know his schedule.  She wasn't even in at work at the time he did that, he was supposed to let her know where he was, and there was no email option so he used paper to inform her.  There was no policy against this.  Nevertheless, this was one of the items on the warnings he was shown but not given on Jan. 14, 2014.

84.   This warning was written up even though Sue Martin herself had used post it notes to communicate.   Martin was never given a warning for using notes.

85.   After the meeting on December 12, Downing never again scheduled a home health visit during his working hours at Select—even with 24 hours' notice.  Because of this, he was shocked when he saw this was being used as a basis to terminate him in January 2014.  This was just pretext for the real reason, which was his whistleblowing.  The reason Downing knows this is because he was told for the first time about needing 24 hours' notice on December 12th, and followed that rule from that day.

86.   On January 14, Downing discussed the allegations with Davis and disputed them.  Davis said he needed to speak with Murray before going any further and took the documents with him when he left.  He would not give Downing a copy.

87.   Downing worked the rest of the day and did not hear from Davis until he was leaving the building.  There were no phone calls or other interactions with anyone else.

88.    As Downing was leaving, Davis pulled Downing into the building's chapel and said he was told to terminate him.  When Downing asked why, Davis said it was because he had spoken with the Director of Nursing without permission and had refused to sign the warning documents.

89.    Downing told him "You know d*** well I did not refuse to sign the documents, and I was not even provided the opportunity to read the documents."  Davis stated "I know. This decision is not mine."

90.    Select's decision to write Downing up in mid-January 2014, for conduct back in 2013, was pretext and the real reason Select was doing this was to make Downing an example to other staff for reporting to management Select's illegal and patient-care-inappropriate discharge practices.  The write-ups Select wanted to have him sign but did not give Downing copies of constituted pretext for what was really going on, which was getting rid of the spokesperson for the therapists who were reporting concerns about the legality of refusing to discharge patients who were ready for discharge.

91.    The conflicting and perjurious testimony given by Select at the Maine Human Rights Commission factfinding hearing added to Select's lack of credibility and, in confirming pretext, created a basis for inferring discriminatory intent.

92.    When Murray testified at that hearing, he stated that the policy was that post it notes were ok to use except when addressing changes in schedule.  When he saw that Sue Martin had used post it notes to discuss schedules, and was asked to specify what the policy was in light of that, he claimed he had been misquoted and said, no, what I said was that post it notes were just not to be used when leaving the building.  No document confirms this post-it note rule.

93.    Rob Davis agreed at the hearing that he met with both Sue Martin and Brian Downing in December 2013 about their communication.  He had no plausible explanation for why he

wrote up Brian about the use of notes but not Sue Martin.  He said that Sue got no

discipline of any kind at any time.  When asked by the investigator why not, Davis said,

"I never got around to it."  Then he added that he didn't know that a verbal warning form

existed until he spoke to Murray later.  He could not explain why he managed to use this

form for Brian Downing but never for Sue Martin though.  Nor could he explain how it

was that a person like him, with the power to fire and to discipline, had no idea what

forms even existed.

94.    On January 14, Davis also informed Downing that Murray had told him that he had

spoken with the Director of Nursing and Administrator about alleged negative statements

made by Downing.  This was a false statement by Murray, which Downing knew having

spoken to the Nursing Department himself.

95.    Brian was shown no warnings until after a decision had already been made to terminate

him.  The point of a warning is to help coach an employee into changing their behavior

and giving them a heads-up on what needs to change.  None of the Select witnesses could

explain why Brian would be shown but not given two warnings on the day he was going

to be fired.  E-mails between Murray and Davis indicate that a refusal to sign the

warnings might be grounds for immediate termination but that, otherwise, Brian was to

be terminated at the end of the day after he had seen his patients.

96.    Perhaps the most bizarre part of the hearing was regarding the letter written by HR head,

Terry Klonowski, to Brian Downing giving him the alleged reason for termination.

Klonowski's May 1 letter states, "At the time of your employment termination, I

discussed these reasons with you."  Downing had never spoken to Klonowski however!

97.    At the hearing, the head of HR, Klonowski, could not recall much about the claimed

phone call except that she thought it happened when Brian was terminated.  When asked

if she introduced herself on the phone, which might explain why Brian felt he had never

spoken to her, she stated that "most likely John [Murray] would have done the introductions."  She could not otherwise recall what was said.

98.  Although she was head of HR, Klonowski said she was not involved with the issuance of the warnings.  She just said, "they had come with some complaint."  She had no idea what happened between mid-day and the end of the day that led Brian Downing to then being fired after being shown the warnings.  Her memory was that she said virtually nothing during this phone call.

99.  She said *Murray* did all the talking.

100.  Then Rob Davis was called and he testified that he let Downing know he was being fired in person, not on the phone and not with Murray or Klonowski.  He had not heard HR testify about any phone call.  He explained that he came into the facility on January 14, 2014, and he had a written warning already written out.  He couldn't recall how much of the warnings that Downing was able to read before he took them back.  He explained that the decision to terminate was made the weekend he came back to work (Jan. 12 and 13) and he found out in a conversation with Murray.  He really wasn't involved in the decision and that he had come "in after the fact."

101.  Davis's testimony contradicted Murray's and Klonowski's, who said Downing was terminated on the phone. Davis said he terminated Downing in person by himself.

102.  Attached as Exh. A is a true and accurate copy of the Commission investigator's discussion with Davis after the hearing.

103.  After Davis, Vice President Murray testified.  Murray claimed that Downing was told that he was fired via conference call, which call was somehow set up – he didn't recall how – despite the fact that Downing had a full schedule of patients to see.  This conference call, which is reflected nowhere in the personnel file documents, according to

Murray took place on January 14, the day Downing was fired.  It included, according to only Murray, the head of HR, himself, and Davis.

104.  Not realizing that HR had already testified that HE, Murray, had taken the lead on the conversation, making it possible that Downing did not even know that HR was on the call, Murray proceeded to testify that *Klonowski* took the lead on this claimed conference call and informed Downing he was fired.  Murray, contrary to what Klonowski said about HIM, testified that he spoke very little and that she took the lead.  He also stated that this was how Downing was told he was fired.

105.  The bottom line is that no call took place and both Klonowski and Murray lied about the other taking the lead in the conversation that never occurred.

106.  In addition to the factual inaccuracy of Murray's testimony stated above, Murray also testified at the hearing that the decision to fire Brian Downing was not made until January 14.  He was asked quite pointedly if he was sure about that and he said yes.  He was then shown the emails where, on the 13th, he emailed Davis to fire Downing the next day but do it only after all the patients had been seen.  At first he pretended he couldn't see that part of the email.  When it was read to him and pointed out, he finally agreed that perhaps the decision was in fact made the day before.  If there was nothing to hide, there would be no reason to lie.

107.  At the time Downing was fired, he had no warnings or discipline that he had been given.  Downing was not even *shown* any write ups until after a decision had already been made to terminate him.  The point of a warning is to help coach an employee into changing their behavior and giving them a heads-up on what needs to change.  None of the Select witnesses could explain why Brian would be given two warnings on the day he was going to be fired.

18

108. In Select's letter dated May 1, 2014, laying out the grounds for termination, Select's head of HR wrote: "you were generally unprofessional and negative during working hours, disrespectful to Drs. Dickens and Coughlin." This statement was false.

109. Dr. Coughlin sent Downing an email saying he had never been disrespectful to her.

110. The May 1 letter also stated that Downing was "negative during working hours."

111. When asked for any evidence to support that, Davis said it was "an aura type of thing." Davis testified there was nothing specific.

<u>**COUNT I**</u>
**VIOLATION OF WHISTLEBLOWERS' PROTECTION ACT**
**26 M.R.S. § 833(A)**

112. Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

113. Downing incorporates by reference the chart attached as Exh. B.

114. Select intentionally discharged Downing or discriminated against him with respect to tenure, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions taken by Downing that are protected under the WPA, in violation of the MHRA, 5 M.R.S. § 4572(1)(A).

115. Downing was singled out for treatment that non-whistleblowers were not. For example, his supervisor Davis agreed that he met with both Sue Martin and Brian Downing in December 2013 about their communication. He had no explanation for why he wrote up Brian about communication but not Sue Martin. He said that Sue got no discipline of any kind at any time.

116. When asked by the Maine Human Rights Commission investigator why not, Davis said, "I never got around to it." He could not explain why he managed to use this form for

Brian Downing but never for Sue Martin.  Nor did he explain how a person like him, with the power to fire and to discipline, had no idea what forms even existed.

117.   Downing reported to Select what he had reasonable cause to believe was a violation of state or federal law.  26 M.R.S. § 833(1) (A).

118.   As a result of this report, Select fired Downing.

119.   As a proximate result of Select's unlawful conduct alleged herein, Downing has suffered job loss, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

120.   Downing has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and Select is likely to perpetrate similar acts on others unless they are enjoined by this Court.

121.   Select's unlawful conduct alleged herein was intentional.

122.   Select's unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Downing's rights.

## <u>COUNT II</u>
### VIOLATION OF WHISTLEBLOWERS' PROTECTION ACT
### 26 M.R.S. § 833(E)

123.   Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

124.   Select intentionally discharged Downing or discriminated against him with respect to tenure, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions taken by Downing that are protected under the WPA, in violation of the MHRA, 5 M.R.S. § 4572(1)(A).

125.   Downing reported to Select what he had reasonable cause to believe was a violation of state or federal law.  26 M.R.S. § 833(1) (A).

126.   Downing also reported to his employer what he had reasonable cause to believe were acts or omissions that constituted deviations from the applicable standard of care for patients at Select, which was charged with care of those patients.  26 M.R.S. § 833(1) (E).

127.   Downing was fired for making his reports of substandard treatment of patients and of failure to provide the care needed based on patient need as opposed to profit to Select.

128.   As a proximate result of Select's unlawful conduct alleged herein, Downing has suffered the loss of his job, lost income, emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

129.   Downing has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and Select is likely to perpetrate similar acts on others unless they are enjoined by this Court.

130.   Select's unlawful conduct alleged herein was intentional.

131.   Select's unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Downing's rights.

## COUNT III
## VIOLATION OF MAINE'S PERSONNEL FILE LAW 26 M.R.S. § 631

132.   Plaintiff refers to and incorporates by reference the allegations made in the above paragraphs.

133.   Downing requested his personnel file pursuant to 26 M.R.S.A. §631 (defining a personnel file as including, but not limited to, "any formal or informal employee evaluations and reports relating to the employee's character, credit, work habits, compensation and benefits and nonprivileged medical records or nurses' station notes relating to the employee which the employer has in his possession").

134.   Section 631 entitles Plaintiff to all documents that reflect on his work history that are in the Defendant's possession.  *See Harding v. Wal-Mart Stores, Inc.*, 2001 ME 13, ¶¶ 11-13, 765 A.2d 73, 75 (stating that a personnel file for purposes of §631 is not limited "to those records physically included within a particular file folder; rather, the language of the statute makes it applicable to any such records the employer has in the employer's possession" and includes any investigative records involving the employee, regardless of how the employer labels them).

135.   Defendant has produced only a portion of Downing's personnel file in response to his requests.  For example, on November 12, 2015, after Select had testified at a Maine Human Rights Commission hearing about notes that were not produced, Select was sent a letter requesting these notes and other documents similarly withheld.  (Exh. C).

136.   There has been no response from Select whatsoever.

137.   The May 1, 2014, letter from Klonowski also states that "Select received complaints" about Downing.  No such complaints were produced in the personnel file.

WHEREFORE, Plaintiff requests that this Court order the Defendant to turn over Plaintiff's entire personnel file; award Plaintiff the maximum civil forfeiture of $500 from Defendant for its failure to produce all records to Plaintiff within the time prescribed by 26 M.R.S.A. §631; and award Plaintiff costs and fees incurred in having to pursue this action.

## PRAYER FOR RELIEF

Downing prays that this Court enter an Order providing as follows:

A.   Enter judgment declaring that the Defendant's practices complained of herein are unlawful as alleged;

B.   Grant Downing a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys and assigns and other representatives, and all persons acting in

concert with it and at its direction, from engaging in any employment policy or practice which retaliates against Downing for exercising his rights under the WPA or the MHRA;

C.      Order Defendant to make Downing whole by providing reinstatement and/or front pay, appropriate back pay, and reimbursement for lost pension, health, Social Security, and other benefits in amounts to be shown at trial;

D.      Order Defendant to pay Downing compensatory damages for non-pecuniary losses, including, but not limited to, pain and suffering, psychological upset, and interference with the enjoyment of life;

E.      Order Defendant to pay Downing punitive damages;

F.      Order Defendant to pay Downing civil penal damages pursuant to 5 M.R.S. § 4613(2)(B)(7);

G.      Order Defendant to pay all litigation costs and expert witness fees;

H.      Order Defendant to pay Downing nominal damages;

I.      Order Defendant to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees to Downing;

J.      Provide the relief requested in Count III regarding Downing's personnel file; and

K.      Grant such additional relief as this Court deems appropriate.

Respectfully submitted,

/s/ Rebecca S. Webber, Esq.
Rebecca S. Webber, Esq. (Bar No. 7908)
*Attorney for Plaintiff*
SKELTON TAINTOR & ABBOTT
95 Main Street, Auburn, Maine 04210
(207) 784-3200
rwebber@sta-law.com

DATED:  November 1, 2016